DowNet, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
Congress has directed this court to adjudicate the claims of “ Samuel Garland, deceased,” against the Choctaw Nation, and to render judgment in such amounts, if any, as may appear to be equitably due, said judgment, if any, “ in favor of the heirs of Garland ” to be rendered on the principle of quantum meruit and paid out of the funds of the nation.
The record is very unsatisfactory in many respects, and as to some questions involved leaves much to be desired. The *56 duty of the court to make such specific findings as will present every feature of the case has therefore been a difficult one, impossible of discharge in form entirely satisfactory, but met as the circumstances seemed to require.
The Choctaw Indians during the period involved in this transaction were a “ nation,” having a constitution, executive and administrative officers, a legislative body of two branches, and a judicial system. Entertaining the belief that they had valid claims against the United States, and particularly, so far as this case is concerned, on account of lands east of the Mississippi River theretofore ceded by them, the general council, by resolution approved November 9,1853, appointed P. P. Pitchlynn, Israel Folsom, Dixon W. Lewis, and Samuel Garland delegates to institute a claim against the United States and settle the same by treaty or otherwise, the resolution providing for the appointment of a successor in case of the death or resignation of any of the said “ delegation.”
Deaths, vacancies, and appointments occurred at different times, and seven men, during its life, served as delegates. Beginning with the full delegation of four, there were for a time three, then four, then three, then two, then one, then one, a new delegate, and finally two. There was no provision as to compensation when the delegation was created, but an instrument purporting to have been executed November 2, 1855, by “ the undersigned chiefs,” provided that the delegation, naming the then members, should receive 20 per cent upon all claims arising under the treaty of 1855 for their services in negotiating that treaty and for other services to be rendered thereafter at Washington. Following the last of these signatures are the initials “ P. C. C. N.,” understood to mean “ Principal Chief Choctaw Nation,” and a notation follows, indicating approval as required by the third section of the schedule of the constitution, October 18, 1868, which section required all contracts theretofore made and approved under existing laws or resolutions of the general council to be approved by the principal chief. It is then understood that instrument was executed by two “ chiefs,” November 2,1855, and approved by the “ Principal Chief,” October 18, 1868, although it does not appear that such a contract had ever *57 theretofore been authorized by the general council. How-ewer, subsequent legislation of the general council set out in the findings seems to recognize the existence of such an obligation.
The treaty of 1855 was negotiated and for more than 30 years thereafter efforts, continuous or spasmodic, were being made to secure a settlement. Action was had by the Senate, an account was stated by the Secretary of the Interior, an action in this court, an appeal to the Supreme Court, a judgment by this court for $2,858,798.62, and finally an appropriation. Just what service was rendered by the delegates during all of this time does not appear, but several attorneys were under contract who presumably attended to the litigation and who were paid large fees. All of the original delegates had died long before the consummation of the matter.
When the litigation was terminated, but before Congress had appropriated to pay the judgment, Campbell Leflore, the sixth appointee as a member of the delegation, was the sole delegate and the principal chief, by an act of the general council, was authorized, “ with the advice and consent of the senate,” to appoint a delegate “to proceed immediately to Washington City, to assist in the settlement of the net proceeds claim,” etc.; and on the same day, February 25, 1888, Edmund McCurtain was appointed and commissioned. Another act of the general council of the same date, February 25, 1888, directed the principal chief to make requisition for 20 per cent of the judgment, and a further sum named in favor of “ Campbell Leflore and Edmund McCur-tain, delegates, successors to P. P. Pitchlynn and others.” After the money had been appropriated by Congress a requisition was made in their favor; it was presented and honored and by a considerable number of drafts drawn and mailed as requested by them, they were in due time paid $638,944.36. They made distribution thereof as shown by a report set out in the findings; and to that distribution the plaintiffs except, contending that many payments made were unauthorized; that there is a large additional sum due them — viz, the difference between the amount received by them and one-fourth of the whole fund; that Leflore and *58 McCurtain were the “ agents ” of the nation in making sucli distribution, for whose unauthorized acts the nation is liable and by which they are not bound, and that therefore they are entitled to recover from the nation the sum sued for.
This statement of the case is but a brief summary and reference must be had to the findings for the details of the transaction there set out so as to furnish as complete a history thereof as the record permits.
There are several questions presented by counsel and proper for consideration and to which brief reference will be made; but there seems to be one underlying question, the determination of which adverse to the plaintiffs must foreclose their right of recovery, and upon which the court bases its conclusion. Were Leflore and McCurtain, when they collected and distributed this money, merely the “ agents ” of the Choctaw Nation, for whose misapplication of the fund, if they did misapply it, the nation was liable, or were they then the delegation, the successors of the original delegation, standing in such relation to the nation and to other members of the delegation or their beneficiaries that the payment made to them, as it was made, is to be held an acquittance of the nation? If they were merely the agents of the nation appointed to discharge obligations of the nation to other individuals, and entrusted with money for that purpose, and other delegates or their beneficiaries stood in the relation of individual claimants, it would then of necessity be incumbent to inquire and determine whether there was misapplication of the fund and a failure, by reason thereof, to award and pay plaintiffs that to which they were entitled.
This transaction, from the appointment of the original delegation to the issuance of the requisition to Leflore and McCurtain on which the money was paid to them, covered a period of more than 35 years. While it probably was not anticipated that such a length of time would be required to procure a settlement, the Indians were familiar with the difficulties and delays attendant upon the adjustment of their claimed rights, they were in this instance seeking to assert rights under a treaty then 23 years old, they must have anticipated that a speedy adjustment might not be procured, and to guard against contingencies liable to happen with the *59 lapse of time, they provided in the resolution creating this delegation for successors in the event of death or resignation. The resolution itself justifies the conclusion that they were not simply appointing the four men named, as individuals, to the discharge of a designated duty, but that they were creating a continuing body, which they saw fit to call a “ delegation,” and to membership in which the four men named were the first appointees. They were individually, it is true, “ appointed delegates,” but they were given broad powers, not only with reference to the claim involved here, but with reference to “ all and every claim and interest of the Choctaw people against the Government of the United States,” succession was provided in case of resignation or death of any of the said “ delegation,” and the chiefs were required to inform the Government at Washington of the appointment of “the delegation.” A “ delegation ” may be said to be a body composed of “ delegates,” and “ delegates ” are members of a “ delegation.” Had the collective word “ commission ” been used, and the appointees called “ commissioners,” the view under discussion might, by reason of common usage, the more readily occur.
Vacancies occurred. The first was by reason of the death of Lewis, and Peter Folsom was appointed. The first act set out in the findings subsequent to the appointment of Peter Folsom as successor to Lewis, an act approved November 18, 1867, is significant in some of its. provisions. It recites that whereas Pitchlynn, Israel Folsom, Garland, and Peter Folsom were appointed and commissioned delegates of the Choctaw Nation to institute a claim against the United States for pay and remuneration for the country ceded east of the Mississippi Liver (the same claim referred to in the resolution first creating the delegation); and whereas said delegates did effect a basis for payment of said claims as mentioned in the eleventh and twelfth articles of the treaty of June 22, 1855 (antedating the death of Lewis), “the delegates composed of P. P. Pitchlynn, Israel Folsom, Samuel Garland, and Peter Folsom, are hereby notified,” etc. Although the personnel is changed it is recognized as the delegation in charge of the claim referred to in the original resolution and this *60 body with a successor member is credited with effecting the basis of settlement provided in the treaty of 1855. This can hardly be regarded as an inadvertence or the blundering of an ignorant people. These people have shown too conclusively their aptitude with reference to this matter. Rather does it indicate their theory as manifest throughout this whole period that the things done and to be done were the work of a duly constituted and continuing body, and the word “ delegates ” as used in this act is evidently used in a collective sense.
Following the deaths in order of Garland, Israel Folsom, and Pitchlynn there were no appointments to fill the vacancies; but the authority of the remaining delegate, Peter Folsom, was recognized and significantly so. Under date of April 26, 1881, a contract, set out in the findings, with John B. Luce, attorney, for the prosecution of the net proceeds claim, is executed in the name of the Choctaw Nation “ By Peter Folsom, its delegate.” In the recital he refers for his authority to the resolution of November 9,1853, and a subsequent resolution. An act of the General Council of February 25,1888, reciting this contract among others, specifically recognized them and each of them as valid and subsisting contracts duly authorized by law and refers to the “ delegates ” executing the contracts as acting under the authority conferred by the act of the National Council approved November 9, 1853, and other acts. As to the vacancies which remained unfilled it may be suggested as fairly appearing from the record that the work remaining to be done was work to be handled by the attorneys rather than delegates and it may have been thought that, under the attendant circumstances, there was no occasion for maintaining a full delegation.
Campbell Leflore was appointed a delegate, whether before or after the death of Peter Folsom does not appear, but probably after, since the record contains no showing of joint action by them. His appointment does not appear in the record but in several acts of the council entrusting to him financial transactions of considerable magnitude, he is officially designated as “ the authorized delegate of the Choctaw Nation.” Aside from what appears in acts hereafter to be *61 referred to the inference is justified that he was appointed to the delegation provided for by the resolution of 1853 under the authority therein contained.
When the general council was making provision for the settlement of the net'proceeds claim and the distribution, after the money should become available, of such portion as was necessary to pay obligations, it authorized, probably to be construed as directed, the appointment of a delegate “ to proceed immediately to Washington City” and assist in the settlement, much as the old delegation in 1857 had been directed “to proceed to Washington city as soon as practicable,” and Edmund McCurtain was appointed. It is interesting to note the formality of the appointment, for he was not only to be appointed “ with the advice and consent of the Senate” but he was “commissioned” in due form, lie was not appointed an agent merely, but he was appointed “ a delegate ” and commissioned “ in and for the office aforesaid.”
An appropriation act defined the then status of Leflore and McCurtain by providing, after appropriating the 20 per cent, that it should be paid to “ Campbell Leflore and Edmund McCurtain, delegates and successors to P. P. Pitch-lynn and other delegates of 1853,” and the act authorizing the principal chief to make requisition provided that it should be in favor of “ Campbell Leflore and Edmund McCurtain, delegates, successors to P. P. Pitchlynn and others.”
What service, if any, was required of these delegates at Washington in connection with the procuring of the appropriation does not appear, but when McCurtain was appointed the appropriation had not yet been made, although the judgment was two years old, and, Leflore probably being in Washington, McCurtain’s direction to proceed thence and assist was probably intended as a direction to “ assist in the settlement of the net proceeds claim ” by procuring an appropriation, since they were not furnished with a requisition until several months thereafter and could not have been sent there at that time to draw money not yet appropriated, and as to which the proper authority had not yet been issued them.
*62 What has thus far been said has perhaps assumed undue length, but it seems to be justified because of the light it throws on the status of the delegates and the delegation during the whole period, as viewed by the Choctaw Nation, and hence upon the status of Leflore and McCurtain when they received this money and made the settlement in question. During the whole period there had been delegates or a delegation recognized as in charge of the net proceeds claim by virtue of the resolution of 1853 and always recognized as the delegation created by that resolution or their successors; and it seems quite clear that when requisition was directed to be made in their favor for the money deemed due the delegation and its creditors, the Choctaw Nation assumed to deal with them as the then delegation, delegates as they were described, successors to Pitchlynn and others, delegates of 1853.
It is to be noted in this connection that when the general council appropriated this money and directed it to be paid to Leflore and McCurtain, delegates, successors, etc., they provided in the act that it should be accepted “ as a complete payment and a final discharge of all debts and obligations of the Choctaw Nation to said delegation under said contract.” These people were Indians, it is true, but many of them were men of affairs, men of business acumen; some had attained some degree of legal knowledge, at least such as might be required in dealing with their own affairs, and it is unreasonable to assume that they would undertake to discharge a recognized obligation by turning money over to persons who were strangers to the transaction and who were without authority from the obligees and attempt to provide that such procedure should work a discharge of the obligation. There is no apparent escape from the conclusion that the nation, represented by its general council and its principal chief, assumed to deal with the proper representatives of the delegation, created in the first instance by the resolution of 1853, and it is our opinion that Leflore and McCurtain were then properly acting in that capacity and not as mere agents of the nation with reference to this particular payment.
If this conclusion as to the status of this delegation and of Leflore and McCurtain, its then membership, as to the Choctaw Nation be correct, the question may yet be suggested as *63 to their relation to the plaintiffs. Were they bound by the payment made to Leñore and McCurtain, and was the nation thereby discharged from any further demands by them ?
They are suing as the heirs of Samuel Garland, and they can have no greater right than to stand in his stead as to any sum due him. There never was any delegation of power to or any contract with Samuel Garland individually. He was simply one of the four delegates first appointed a member, with three others, of the delegation created by the resolution of 1853. That delegation was a creature of the nation, deriving its life and its authority from an act of the nation’s duly constituted legislative body. Neither Garland nor any other of the appointees had any right to stipulate as to constitution, power, term of service, or compensation of the delegation. It was in no sense a transaction which gave right of negotiation as to contractual relations. He or any other appointee might presumably have declined appointment, but having accepted appointment he accepted all the conditions attendant upon the creation of the delegation. He thus accepted appointment to a delegation which he must have known was intended to be a continuing body and as to the membership of which the right of substitution was expressly declared. Indeed, he was necessarily cognizant of the exercise of this right. He was yet in life and a member of the delegation when Lewis died and Peter Folsom was appointed a delegate. He served on the delegation as thus reconstituted and after the substituted member had become its “ business manager,” and he necessarily knew of subsequent legislation referring to the other two survivors, himself, and the substituted member as “ the duly appointed delegates and commissioned as such ” in connection with the prosecution of the net-proceeds claim, and referring to the delegates as “ composed of” Pitchlynn, Israel Folsom, himself, and Peter Folsom. He knew, could not but have known, that these delegates, or this delegation, an immaterial matter of phraseology, were, although of different personnel, the delegates or delegation authorized by the resolution of 1853. He accepted and continued service under such circumstances as must necessarily imply full knowledge on his part that he was but a member of a continuing body with succession in member *64 ship and liable to complete change of personnel. No doubt, if his mind adverted at all to the subject before his death, he assumed that a successor would be appointed to his place on die delegation.
By Garland’s will his “ interest in the net proceeds ” went to his widow. Assume that John Doe had been immediately appointed his successor and that thereafter, before the death of any of the other then delegates, the net-proceeds money had become available and a requisition had been authorized and drawn in favor of Pitchlynn, Israel Folsom, John Doe, and Peter Folsom, the then delegates, successors to the delegation of 1853, just as it was authorized and drawn in favor of Leflore and McCurtain, and upon settlement of obligations of the delegates and distribution of the remainder Mrs. Garland had maintained that some of the payments of assumed obligations made by the delegates were improperly made, by reason of which the amount awarded her was less than she should have received, is it likely to have been seriously contended that such a situation furnished a basis for a claim by her against the nation ? The analogy is easily carried on to the plaintiffs and Leflore and McCurtain, the then delegates, successors, etc. We incline to think that had the vacancies in this delegation been filled as they occurred, as there was authority for doing, so that there was at all times a full delegation, and there had been in existence when this payment was about to be made such a full delegation, and the payment had been made to such full delegation just as it was to Leflore and McCurtain, this question would not likely now be before us. And yet such an existent delegation could have stood in no other relation to the nation and these plaintiffs than did Leflore and McCurtain.
For what it is worth, the apparent acquiescence of these plaintiffs in the action of the Choctaw council providing for the payment of this money to Leflore and McCurtain is for consideration, for even though acquiescence indicated by knowledge coupled with failure to protest might not amount to estoppel, it would have weight as indicating recognition of the propriety of the action taken.
These people were not in ignorance of this claim. It was the subject of testamentary provision in the wills both of *65 Samuel Garland and bis widow, and the subject, it appears, of family discussion. After prolonged litigation, of which they must have known, judgment for the large sum involved in the net-proceeds claim was rendered by this court December 15,1886, and appropriation by Congress to pay this judgment was made by an act approved June 29,1888, more than two years after. The appropriating act of the General Council directing payment to Leflore and McCurtain “ as a complete payment and final discharge” and the act directing requisition in their favor were passed February 25, 1888, before the appropriation by Congress. The requisition was not drawn until July 9, 1888; presented July 13, settlement by auditor July 24, certified by comptroller July 27, and drafts mailed July 28. The actions of the general council several months before the money was paid were by public acts in regular session. It was no doubt a matter of public notoriety. It appears that many members of the tribe habitually attended the sessions of the council. Crockett Garland, at least, of those in interest, was a man of prominence in the nation. He became a member of the general council either in 1888 or soon after. He must have known that from February 28, 1888, Leflore and McCurtain were the recognized delegates, and that the money, when appropriation had been made by Congress, was to be paid to them. The only inference is that he and they either acquiesced in the action taken or recognized the fact that it wras an authorized and proper action on the part of the council furnishing them no ground of protest. It is not incumbent on us to suggest action which might have been taken if they regarded the procedure as unauthorized.
We are of the opinion that the payment made to Leflore and McCurtain served to discharge the nation from any further liability in this matter to the delegation or any member thereof or their representatives, and on this ground it is ordered that the case be dismissed.
It is perhaps well to mention and possibly comment briefly on other questions in this case, not decided, since the conclusion as to the one discussed is sufficient for the purpose, and as to which there may or may not be difference of opinion.
*66 If tbe conclusion reached on the question discussed is erroneous, then the question as to whether the distribution made by Leflore and McCurtain was authorized is for consideration. And in that connection the plaintiffs, not questioning that distribution was in fact made as shown in the report set out in the findings, contend, first, that the report is not admissible in evidence because not shown to be official and presented to and acted on by the general council; and, second, that payments therein shown were unauthorized. For consideration in connection with this whole transaction is its thoroughly “ open and above board ” character. The public character of the acts of the council and the requested procedure as to the payment of the money have been referred to. The payments to the Garlands were made personally, after their presence had been requested, and were made at the First National Bank in Fort Smith. There was no duty imposed to prepare and print and circulate a report as to the distribution of the 20 per cent, but it was done, and done in such a way as to give the greatest possible publicity.
It is shown that copies of the report were distributed generally at a meeting of the general council, both to members of the council and to nonmembers, and that copies were filed in the office of the national secretary. A copy in evidence bears in handwriting the name of a man shown to have been national treasurer. There was no requirement that a detailed report as to the distribution of the 20 per cent should be submitted to and acted on by the general council. Instead the theory upon which the payment was made to Leflore and Mc-Curtain would seem to preclude any occasion for a report to the council which should be the subject of approval or otherwise as to the details of the distribution. The payment was made to them as the delegates, successors, etc., was deemed by the council and stipulated to be “ a complete payment and a final discharge,” and it was made “ to enable them, (italics ours) to pay the expenses and discharge the obligation in the prosecution of said claim, and to settle with the respective distributees of said delegation.” It is hard to see what more could have been done to give publicity to this settlement, and the copy of the report offered in evidence is identified as one of the printed copies generally circulated as described. .It *67 seems to have been in the nature of a public document, complete within itself for the purposes intended.
Assuming that it is properly in evidence it is not disputed that it correctly shows the distribution made of the 20 per cent. Contention is that some of the payments made, and particularly those under the heading “ Paid from memorandum of P. P. Pitchlynn ” and “ Paid on promises made at Tushkoliomma,” were unauthorized. But little specific information appears in the record as to the basis of those payments. One, made to a man of prominence and influence, is shown to have been predicated alone, as to service rendered, on the “ sympathy ” of the witness. Many of the payees are shown to have been members of the council or those who were in the habit of attending meetings of the council. Pitchlynn in his will refers to debts in connection with the net-proceeds claim which he says he has shown in a separate statement for the information of Folsom. Pitchlynn had been business manager for several years and active in the work of the delegation, and had been succeeded as business manager by the Folsom referred to. There is some evidence of indebtedness on the part of members of the delegation for borrowed money, but as to many of these payments the contention of counsel for plaintiffs that they were in the nature of bribes to members of the council and payment to lobbyists is probably correct. That theoi’y at least is better sustained than any other.
Plaintiffs’ counsel, in their brief,-say:
“It is well-known history of the Choctaw Nation that many members of the council were corrupt; paid lobbyists were always present when the council was in session securing improper legislation upon payment of fees. In order to prove this it is only necessary to read the purported report filed by Campbell Leflore and the testimony of ex-Grov. Dukes, former governor of the Choctaw Nation and one of the political leaders.”
Dukes is the witness referred to as testifying to the payment to him of $1,500 for “sympathy.” And it may be added that when the council referred in the appropriating act to the payment of expenses and discharge of obligations it probably had in mind obligations of this character, the ex- *68 isten.ce of which were open and notorious. Assuming it to be established, as may at least be fairly inferred, that many of these payments were in fact of this character, can these representatives of Samuel Garland recover from the nation on account thereof ? Could Samuel Garland, if yet in life, recover from the nation because delegates in making settlement liad redeemed such an obligation of his, on the ground that it was an illegal obligation? He might contest the right of the obligee to demand and receive payment, but having participated in such an illegal transaction he could hardly, after payment, make its illegality the basis of a claim against the nation. Can his representatives assert any right which he could not himself have asserted ?
The judgment, if any, in this case is directed to be rendered “ on the principle of quantum meruit for services rendered and expenses incurred.” There is no testimony either as to the specific service rendered by Samuel Garland or its value. There is an alleged “contract” in the record — an ex-parte document — signed first by two chiefs, who had no authority, and approved 13 years afterwards by the principal chief “ as required by the third section of the schedule of the constitution,” although authority so to do does not appear. However, subsequent legislation of the. general council recognizes the existence of a contract under.which the delegates were to receive 20 per cent of the net proceeds claim.
When Congress confers special jurisdiction on this court in such language as that used in this instance, it must be deemed to have intended to withhold any jurisdiction to adjudge a recovery on express contract and the court must exorcise only the jurisdiction conferred. The contract, if there was a contract, although not the basis of a recovery, might be admissible, in the absence of other evidence, as evidence prima facie of the value of the services contemplated thereby. But, even in the absence of other evidence, could the recognition of the contract as admissible evidence go far enough in this case? If admissible as proving the value of the services does it not go to the value of the services of all the delegates? The theory of the action is that these plaintiffs or the heirs of Garland were entitled to one-fourth of the *69 whole compensation of 20 per cent. This theory can hardly be sustained. It must be predicated on the idea that compensation went alone to the four delegates first appointed and in equal parts. There were seven delegates in all. Even eliminating Leflore and McCurtain there were five theretofore. Lewis had died before 1860 and Peter Folsom had served many years and had been the head of the delegation, the “ business manager,” and yet the theory stated, carried to its logical conclusion, would entitle Lewis to one-fourth of the whole compensation and give Peter Folsom no part at all. There is no testimony as to the extent of the service actually rendered by Garland, who died several years before the consummation of this matter, and the question is whether there is any basis for a quantum meruit recovery on account of his services. Payments made to him and his “ heirs ” were sufficiently large to compensate for a considerable service.
But counsel present another theory under which they contend that if the court should consider the report of Leflore and McCurtain and conclude that some of the items shown therein should have been paid, the plaintiffs, in that event, should recover one-fourth of the amounts under the heads “ Paid from memorandum of Pi P. Pitchlynn ” and “ Paid on promises made at Tushkohomma.” In other words, the court, conceded the right to charge against these plaintiffs some payments made by Leflore and McCurtain, as shown by their report, must hold the nation liable for other payments made because the obligations discharged were incurred for an illegal and a corrupt purpose, and this, too, notwithstanding participation in the corruption. We have commented on the principle involved.
It is contended that the remedy of the plaintiffs, if they were entitled to a remedy, was against Leflore and McCur-tain in the courts of the nation or other courts having jurisdiction. The point is mentioned without comment, except the suggestion that there is some testimony indicating that that was the view of the matter first entertained. Whether an action was ever prosecuted to conclusion does not appear.
The fact that some eight years after this settlement by Leflore an act passed both houses of the Choctaw Council providing for the payment to these plaintiffs, or some of *70 them, of $115,786.65 as the amount due them by reason of the contract of November 2, 1855, is cited as amounting to a recognition of an indebtedness on the part of the nation in that amount. The act was vetoed and did not become a law. Aside from that the court is always entitled to weigh the evidence, and may be excused if it should in that connection entertain a suspicion that the passage and approval of that act would have given rise to many obligations no better founded than those paid by Leflore about which complaint is made.
The action is by “ The heirs of Samuel Garland.” The jurisdictional act authorized an adjudication of the claims “ of Samuel Garland, deceased,” but provided that the judgment, if any, “ in favor of the heirs of Garland ” should be paid, etc. Garland died testate, this claim passing to his Avidow, Mary P. Garland. She died testate, and the beneficiaries under her will are as stated in the findings. They are the same persons who would have been the heirs of Samuel Garland had he and his widow both died intestate, but their interests under the will of Mary P. Garland are different from what their interest would have been in the other event. May the apparent legislative intention cure the inaccuracy ?
Judge Hat, Judge Barnet, Judge Booth, and Chief Justice Campbell concur.